UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
THOMAS WOODS,                       )
                                    )
                 Petitioner,        )
                                    )     CIVIL ACTION
            v.                      )     No. 15-13776-WGY
                                    )
SEAN MEDEIROS,                      )
                                    )
                 Respondent.        )
_____)

YOUNG, D.J.                                    June 8, 2020

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

This petition for a writ of habeas corpus arrives after years of back and forth in the courts of Massachusetts.  The original criminal prosecution of Thomas Woods ("Woods") for first degree murder, in which he was haled in front of a grand jury while unknowingly the target of the investigation, led the Supreme Judicial Court to introduce a new, prospective rule requiring law enforcement to warn targets of their rights.  The Supreme Judicial Court did not apply this rule to Woods, and he now comes before this Court asking for relief.

The underlying facts of Woods's habeas corpus petition concern the late-night killing of his friend Paul Mullen by two masked men, and the subsequent investigation that led to his indictment as their accomplice.  See Commonwealth v. Woods, 466

1

Mass. 707, 708 (2014), cert. denied, 134 S. Ct. 2855 (2014)
("Woods I"); Commonwealth v. Woods, 480 Mass. 231 (2018), cert.
denied, 139 S. Ct. 649 (2018) ("Woods II").  A Massachusetts
jury found Woods guilty of murder in the first degree in
violation of Mass. Gen. Laws ch. 265, § 1.  Suppl. Answer (Vol.
I) ("S.A. I") 10, ECF No. 20.  He was sentenced to life in
prison without parole.  Id.  Woods appealed his conviction in
the Massachusetts courts alleging that there was not enough
evidence at trial for a jury to find him guilty beyond a
reasonable doubt, that his grand jury testimony was introduced
at trial to undermine his credibility when he was a target of
the investigation and had not been warned of his right to avoid
self-incrimination, and that he was deprived of his rights under
Massachusetts's Humane Practice Rule.  See generally Woods I,
466 Mass. 707; Woods II, 480 Mass. 231.

Upon denial of those claims by the state courts, Woods
requests habeas relief on several grounds.  See Am. Pet. Writ
Habeas Corpus ("Am. Pet.") 1, ECF No. 32.  First, he argues that
there was insufficient evidence for the jury to find beyond a
reasonable doubt that Woods intentionally participated in the
murder, that the victim of the shooting was the shooter's
intended target, and that Woods was involved in a joint venture
with the shooter.  Id. at 6.  Second, Woods argues that the
Commonwealth violated his Fifth Amendment right against self-

incrimination because, despite being a target of the investigation, he was not informed of his rights, not represented by an attorney, and his grand jury testimony was offered at trial against him.  Id. at 8.  Third, Woods argues that for the above reasons he was deprived of his rights under the Humane Practice Rule.  Id. at 9; see also Commonwealth v. DiGiambattista, 442 Mass. 423, 446-48 (2004) (examining the Humane Practice doctrine and the Massachusetts jury instructions regarding voluntariness of unrecorded confessions).  Fourth and fifth, Woods argues that he was the victim of both ineffective assistance of counsel and prosecutorial misconduct because the prosecutor did not tell the judge that he was target of the grand jury investigation and his attorney unreasonably failed to object to such misrepresentation or file evidence indicating his target status.  Am. Pet. 11-11A.

## II.  Procedural History and Relevant Facts

### A.   The Original Investigation and Trial

In his habeas petition, Woods does not contest the specific factual findings by the Supreme Judicial Court, but rather whether these findings are legally sufficient to support a verdict.  When a federal court conducts habeas review of a state criminal conviction, "determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence."  28 U.S.C. §
2254(e)(1).  Thus, for its description of the facts, this Court
defers to the Supreme Judicial Court.

Woods and the victim, Paul Mullen ("Mullen"), were longtime
friends, but had a rift because Mullen owed Woods money.  Woods
I, 466 Mass. at 709.  On several occasions Woods expressed his
intention to "shoot" or "kill" Mullen.  Id.  The night of the
shooting, Woods agreed with Mullen to meet at a gas station, and
once there, Mullen -- while in the driver seat of Wood's car --
was shot by two masked men who were never identified.  Id. at
708 & n.1.  Woods was loitering inside the gas station store
during the shooting, but after finding Mullen's body in his car
Woods moved the body out of the car and drove to his
girlfriend's house.  Id.  Once there, a witness saw Woods
talking to a "five foot ten inch tall black man . . . wearing a
dark hooded sweatshirt and dark jeans."  Id. at 711.  Woods's
girlfriend indicated she saw a man "walking away from [Woods]
while waving at him.  She described him as a thin man, standing
about five feet, seven or eight inches tall, wearing dark jeans,
a black hooded sweatshirt, and a Carhartt-brand jacket."  Id. at
712.  These descriptions coincide with witnesses' descriptions
of one of the shooters, who was also described as wearing a
Carhartt jacket.  Id. at 708.

The police interviewed Woods twice at the police station, reading him his Miranda rights prior to the second interview. Id. at 712.  During this second interview, on February 6, 2006, the police informed him that some of his previous statements were not true, to which Woods responded that he did not want to be considered a "snitch."  Id.  Woods testified before the grand jury four days later, on February 10, pursuant to a summons. Resp't's Mem. L. Opp'n Pet. Writ Habeas Corpus, Addendum 1, Plymouth County Grand Jury Summons, ECF No. 41.  There, Woods presented an exculpatory version of events, and explained several inconsistencies in his prior discussions with police. Woods I, 466 Mass. at 712.  At trial, the prosecution presented his grand jury testimony as evidence of his "conflicting stories and outright lies" in order to impeach his credibility.  Id.

### B.  Procedural History

Woods' petition comes after significant litigation in the Massachusetts courts, including two decisions of the Supreme Judicial Court.  See Woods I, 466 Mass. 707; Woods II, 480 Mass. 231.  These appeals stem from Woods' conviction in the Superior Court on May 20, 2009 following a jury trial.  S.A. I 10.

Prior to his conviction, Woods testified before the grand jury without the benefit of counsel, and the only warning of his rights was an admonition to tell the truth.  Woods II, 480 Mass. at 234 & n.3; S.A. I 149-50.  When the Commonwealth informed the

court that it intended to introduce the grand jury evidence at
trial, Woods filed a motion in limine to exclude the testimony
"because he was a target of the investigation but did not
receive 'any warnings that he didn't have to submit to that
questioning or that he could assert his Fifth Amendment
privilege.'" Woods II, 480 Mass. at 233-34. The trial judge
stated that he did not know if such a warning was required in
state criminal proceedings. Id. at 234. He asked the
prosecutor if Woods was a target, to which the prosecutor
responded he was a "person of interest" but not yet a target at
the time of the testimony. Id. The trial judge then issued an
oral ruling that Woods was not a target and that his rights had
not been violated. Id. at 235.

Woods argued on his first appeal to the Supreme Judicial
Court that the Commonwealth had presented insufficient evidence
to prove he was guilty of engaging in a joint venture to murder
Mullen. Woods I, 466 Mass. at 708. He also argued that the
trial judge erred in not finding him to be a target of the
investigation, and that he was thus entitled to a warning of his
right against self-incrimination under the Due Process Clause of
the Fifth Amendment. Id. He further requested that the Supreme
Judicial Court order him a new trial. Id. at 708-09.

The Supreme Judicial Court concluded, however, that the
evidence at trial was sufficient to permit a jury to find his

guilt.  Id. at 709.  It further concluded that at the time of the grand jury testimony Woods was not a target of the investigation.  Id.  Most important to the current petition, the Supreme Judicial Court determined that even if Woods were a target, there was no constitutional rule in place requiring he be warned prior to his grand jury testimony.  Id. at 719-20.  The Supreme Judicial Court created a new rule, pursuant to its power of superintendence over the Commonwealth's courts, requiring the Commonwealth to advise targets or potential targets of their rights prior to testimony before a grand jury.  Id. at 720.  The court stressed, however, that Woods himself would not get the benefit of the rule because it was "not a new constitutional rule" and would be applied only prospectively.  Id.

Following the Supreme Judicial Court's decision, Woods filed a new trial motion under Massachusetts Rule of Criminal Procedure 30(b).  See Am. Pet., Ex. 1, Mem. Decision Order Def.'s Mot. New Trial 1 ("New Trial Order"), Commonwealth v. Woods, No. 0683CR498 (Mass. Sup. Ct. Nov. 17, 2016), ECF No. 32-1.  Woods argued that because he was the fifth individual to appear before that grand jury, the prosecution would have known from the other witnesses that he was a target.  Id.  The motion judge credited this argument after considering the testimony of the other witnesses -- which was not considered in evidence at

the original motion in limine hearing -- and ruled that Woods

was a target at the time he testified before the grand jury.

Id. at 5 (citing Woods I, 466 Mass. at 719 n.12)).   Nonetheless,

the motion judge declined to order a new trial, explaining that

the Supreme Judicial Court had determined that Woods was "not

entitled to a warning regardless of his status as a target."

Id. (emphasis in original).

Woods then appealed to the Supreme Judicial Court for a

second time, which decided to consider his request for a new

trial because it presented a "new and substantial question which

ought to be determined by the full court."  S.A. I at 16-17.

There, Woods advanced the argument that the motion judge in

Woods I erred in upholding the admission of the testimony before

the grand jury.  Woods II, 480 Mass. at 237.  Woods also made

ineffective assistance of counsel and prosecutorial misconduct

claims, but the Supreme Judicial Court declined to address those

directly.  Id. at 239 n.10.  Instead, the Supreme Judicial Court

denied Woods' motion for a new trial, ruling that the motion

judge was correct in determining that his status as a target

made no difference to the original ruling.  Id. at 238.  Though

the trial judge had stated that Woods' target status "would

change the whole way that [he would] have to view this" issue,

the Supreme Judicial Court explained that upon reviewing the law

he would have discovered that there was no legal requirement at

that time for the government to give a warning.  Id. at 239
(alteration in original).  Since the court reviewed the denial
of a new trial for "a significant error of law or other abuse of
discretion," it declined to grant Woods' motion.  Id. at 237,
239.

Woods filed for habeas review within one year of the ruling
in Woods I, but this Court administratively closed the petition
pending the motion for a new trial.  See Pet. Writ Habeas
Corpus, ECF No. 1; Electronic Order, ECF No. 11; Order, ECF No.
12.  The instant habeas petition constitutes the reopening of
Woods' previous petition and was filed within one year of Woods
II.  See Mot. Reopen, ECF No. 13.  This Court heard oral
argument from Woods and the respondents ("the government") at a
motion session on February 11, 2020, at which time it took the
matter under advisement.  Electronic Clerk's Notes, ECF No. 49.

## III. Analysis

In his memorandum in support of the petition for habeas
corpus, Woods focuses on three arguments.  The first is that a
reasonable jury could not have inferred that he was involved in
the shooting based on the evidence at trial.  Pet'r's Br. Supp.
Pet. Writ Habeas Corpus ("Pet'r's Mem.") 5, ECF No. 33.  The
second is that the Commonwealth violated his Fifth Amendment
right against self-incrimination by presenting his grand jury
testimony at trial, despite the fact that he was a target of the

9

investigation and was not given any warnings prior to testimony. Id. at 10.  The third is that he was deprived of his due process rights through a combination of prosecutorial misconduct and ineffective counsel related to the presentation of grand jury testimony.  Id. at 16.

In his petition, Woods additionally brought a claim for violation of the Humane Practice Rule art. 12, Am. Pet. 9, and separated his third argument into two separate claims.  Id. at 11-12.  This Court has previously noted that a petitioner who fails to develop an argument for a particular claim may be deemed to have waived that claim.  See Lamartine v. Ryan, 215 F. Supp. 3d 189, 193 (D. Mass. 2016).  Woods mentions the Humane Practice Rules nowhere in his memorandum, so this argument is waived.[1]  See generally Pet'r's Mem.  As his fourth and fifth claims are briefed together, this Court analyzes them together. Id.

### A.   Legal Standard

Habeas petitions seeking relief from state court convictions are reviewed under the standard created by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  AEDPA severely restricts

---

[1] Additionally, the Humane Practice claim was fully adjudicated and denied by the motion judge that considered Woods' motion for a new trial.  See New Trial Order 6-8.

the federal courts' power of independent review by allowing the grant of a writ of habeas corpus only in certain narrow circumstances:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

When applying section 2245(d)(1), "[a] state court decision is contrary to clearly established federal law if it contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but reaches a different result." Companonio v. O'Brien, 672 F.3d 101, 109 (1st Cir. 2012) (internal quotation marks and citation omitted).  A habeas court reviewing a decision under this subsection must ask if the state court's decision was "objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000).

The "unreasonable application" branch applies when the state court identified the correct legal principle but applies

it unreasonably to the facts at hand.  Id. at 407-08.  Under

section 2254(d)(2), a state court's findings of basic or

historical facts "are entitled to a presumption of correctness

that can be rebutted only by clear and convincing evidence to

the contrary."  Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir.

2002).  "Inferences, characterizations of the facts, and mixed

fact/law conclusions are more appropriately analyzed under the

'unreasonable application' prong of section 2254(d)(1)."  Id.

These standards apply only to claims that were adjudicated

on the merits in state court proceedings.  Pike v. Guarino, 492

F.3d 61, 67 (1st Cir. 2007).  A claim not adjudicated on the

merits is reviewed de novo.  Id.

### B.   Woods' Unreasonable Inference Argument

Woods focuses his first argument on the evidence that led

the jury to believe he was connected to the men who killed

Mullen.  Pet'r's Mem. 5.  Woods challenges two inferences

necessary to his conviction: whether it was a permissible

inference that the man he met at his girlfriend's driveway was

the shooter, and whether a jury reasonably could infer that the

two shooters did not act alone, but instead with him as part of

a premeditated plot.  See id. at 7-9 (citing Woods I, 466 Mass.

at 768-69).

Woods cited the guiding principles from O'Laughlin v.

O'Brien, a case in which the First Circuit ruled that a lack of

direct evidence meant there was insufficient evidence to support anything more than "reasonable speculation" that the defendant was guilty.  568 F.3d 287, 302 (2009).  Woods notes the lack of direct evidence in his case, including the fact that no witnesses saw the shooter's face or observed both the shooter and the man in the driveway, and that descriptions of both the shooter and the man in the driveway lacked detail.  Pet'r's Mem. 8.  Woods says that all the evidence produced by the government is amenable to innocent explanation.  Id. at 9.  He also calls the government's theory of the case nothing more than "unreasonable inference (the man in the driveway was the shooter) piled upon unreasonable inference (the two masked men did not act alone)."  Id. (citing O'Laughlin, 568 F.3d at 301; United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995) ("[W]e are loath to stack inference upon inference in order to uphold the jury's verdict.")).

Woods' first argument -- that his conviction was built on several unreasonable inferences -- was adjudicated fully by the Supreme Judicial Court in Woods I.  466 Mass. at 712-16.  This Court reviews the court's conclusions under the "unreasonable application" branch of section 2254(d)(1).  Ouber, 293 F.3d at 27 ("Inferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under the 'unreasonable application' prong.").  In doing so, however, this

Court must keep in mind that the state court was already reviewing the jury's verdict under a highly deferential standard, and this Court's review of the state court's decision is also deferential.  This "twice-deferential" standard on habeas review is particularly difficult for the petitioner to overcome.  See Parker v. Matthews, 567 U.S. 37, 44 (2012). Woods has not done so.

When reviewing the sufficiency of evidence, "the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).  The standard of "beyond reasonable doubt cannot be premised on pure conjecture," but "conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." O'Laughlin, 568 F.3d at 301 (quoting Stewart v. Coalter, 48 F.3d 610, 615-16 (1st Cir. 1995)).  When conflicting inferences are possible from the evidence, "it is for the jury to determine where the truth lies."  Stewart v. Coalter, 855 F. Supp. 464, 468 (D. Mass. 1994) (Woodlock, J.) (quoting Commonwealth v. Wilborne, 382 Mass. 241, 245 (1981)).

The Supreme Judicial Court in Woods I determined that a jury reasonably could infer from the evidence at trial that the shooters acted with premeditation and that Woods was engaged in a joint venture with them.  Woods I, 466 Mass. at 713-15.  The court noted that the evidence for a joint venture was circumstantial, but that "[a] joint venture 'may be proved by circumstantial evidence.'"  Id. at 713 (citing Commonwealth v. Bright, 463 Mass. 421, 435 (2012)).  The court further cited the defendant's threats against Mullen as evidence the jury could consider in showing motive and intent for the murder.  Id.  It also cited the fact that Woods brought Mullen to the gas station and caused him to be sitting in the car when the shooters attacked, as well as his conduct after the shooting.  Id. at 714.  A jury properly could have inferred from these facts, the court held, that Woods had planned the attack.  Id.

The Woods I court additionally ruled that a jury could have permissibly determined the man in the driveway was the shooter based on the similarity of the witness descriptions.  Id. at 714-15 (citing Commonwealth v. Sylvia, 456 Mass. 182, 190-191, (2010)).  Specifically, the court pointed out that a witness identified the shooter as wearing a Carhartt-brand jacket, and a separate witness identified the man in the driveway, with whom Woods met immediately after the murder, as also wearing a Carhartt-brand jacket.  Id.  The other identifying features were

15

similar, if not decisive, thus leading the court to call the
jury's identification "permissible" though not "necessary or
inescapable." Id. at 715.

Woods attacks the sufficiency of the identification
evidence because, unlike in Sylvia, no witnesses saw the
shooter's face or saw both the shooter and the man in the
driveway. Pet'r's Mem. 8 (citing 456 Mass. at 190-91). He also
argues that there was "nowhere near enough detail" to support a
reasonable identification based on the witness testimony. Id.
Woods is correct that there is less identifying information here
than in Sylvia, but "the evidence must be analyzed collectively
to determine if it proves the conspiracy." Commonwealth v.
Beckett, 373 Mass. 329, 341 (1977). In light of the totality of
evidence, the Supreme Judicial Court was not unreasonable in
ruling that a jury permissibly could infer guilt. The
descriptions given by the witnesses were not contradictory, and
the jury could have considered identification along with other
facts concerning motive, intent, and Woods' actions before and
after the shooting.

Woods also attacks the sufficiency of evidence supporting
the government's theory of joint venture as a whole, citing
O'Laughlin for the proposition that a habeas court may grant the
writ when there are innocent explanations that can account for a
defendant's actions. Pet'r's Mem. at 6 (citing 568 F.3d at 302-

04).  O'Laughlin, however, is readily distinguishable.  In that
case, the First Circuit ruled the evidence of motive "weak at
best," whereas in the instant case the prosecution established a
clear motive based on Woods' threats against Mullen over a debt.
Compare O'Laughlin, 568 F.3d at 302, with Woods I, 466 Mass. at
713.  The O'Laughlin court also deemed the circumstantial
evidence of the physical attack weak, whereas in this case, the
jury inferred -- and the Supreme Judicial Court correctly
allowed -- that Woods' actions were consistent with a plot to
lure Mullen to the gas station, and that he communicated with
the shooter afterwards.  O'Laughlin, 568 F.3d at 303.  Finally,
the O'Laughlin court determined that the prosecution had failed
to show "consciousness of guilt" clearly when that determination
was based on little more than the defendant's nervous behavior
and contradictory statements in speaking to police on the night
of the incident, id. at 304, while in the present case, Woods
gave contradictory and false statements to the police on
multiple occasions over the course of several months following
the shooting, Woods I, 466 Mass. at 712.

Most important, the First Circuit ruled in O'Laughlin that
much of the evidence actively contradicted the government's
theory.  568 F.3d at 302-04.  For example, the court noted that
the government had argued the defendant murdered the victim in
order to steal money, but no money was taken.  Id. at 302.

Here, Woods points to no evidence contradicting the government's theory, instead stating only that the government's evidence is "amenable to innocent explanations." Pet'r's Mem. 9. On habeas review, however, a court "may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict." Housen v. Gelb, 744 F.3d 221, 226 (1st Cir. 2014) (quoting Magraw v. Roden, 743 F.3d 1, 7 (1st Cir. 2014)). It was reasonable for the Woods I court to reach the conclusion that the jury's inference was plausible.

### C.   Woods' Fifth Amendment Argument

Woods' second claim focuses on the circumstances surrounding his grand jury testimony: his status as a target of the investigation, compelled by official summons to appear at the grand jury for the purpose of testifying, placed under oath to tell the truth, unrepresented by counsel, and not informed that there was a lawful right to refuse to answer where the answers might be self-incriminating. Pet'r's Mem. 10, 15. He frames the constitutional question involved as pertaining to his right "to allow a defendant's objection to the prosecution's introducing at trial the defendant's own grand jury testimony taken prior to the indictment." Id. at 15. He asserts that this is a different claim than he advanced at trial, and that

"the SJC [in Woods I] never ruled on the constitutional issue." Id. at 11.

Woods next asserts that, reviewing the legal claims de novo, this Court should determine that his Fifth Amendment rights were violated. Id. at 10, 13-14 (citing United States v. Washington, 431 U.S. 181, 190 (1977)). He distinguishes previous cases where the Supreme Court declined to require warnings before a grand jury testimony by explaining Woods was a target, rather than a mere witness. Id. (citing Roberts v. United States, 445 U.S. 552, 562 n.* (1980) (Brennan, J., concurring); Garner v. United States, 424 U.S. 648, 655 (1976); United States v. Mandujano, 425 U.S. 564, 580 (1976)). He also states that, though the First Circuit has never ruled on this exact issue, it has "expressed considerable sympathy with the approach of giving at least notice that a witness need not testify if such would incriminate him." Id. at 14 (quoting, with omitted quotation marks, United States v. Pacheco-Ortiz, 889 F.2d 301, 308 (1st Cir. 1989)). In summary, he argues, the reasoning behind the Fifth Amendment privilege against compulsory self-incrimination requires that this Court rule that his constitutional rights were violated. Id. at 15 (citing Michigan v. Tucker, 417 U.S. 433, 440 (1974) (discussing history of inquisitions and torture in nations that "placed a premium on

compelling subjects of the investigation to admit guilt from their own lips")).

### 1.   Woods' Fifth Amendment Argument Was Decided on the Merits in State Court

In order to avoid the stringent standard of 28 U.S.C. § 2254(d)(1), Woods argues his claim that his Fifth Amendment rights were violated when the prosecution failed to warn him prior to his grand jury testimony was never decided on the merits in state court.  Id. at 10.

Woods first argues that the Supreme Judicial Court never ruled on his "constitutional issue."  Id. at 11.  This is incorrect.  The Supreme Judicial Court in Woods I recognized that Woods argued that "he was a target of the investigation and the Commonwealth was thus required to advise him of his Fifth Amendment right to avoid self-incrimination."  466 Mass. at 716. After examining the question whether he was a target, it then stated: "Even if the defendant were a 'target,' the Commonwealth was under no obligation to warn him of that status."  Id. at 717 (citing Washington, 431 U.S. at 188-90).  It analyzed Supreme Court and First Circuit case law, noting that the Constitution did not require the warnings Woods requested.  Id. at 718-19 (citing Mandujano, 425 U.S. at 580-81; Pacheco-Ortiz, 889 F.2d at 308 (holding that warnings were not constitutionally required where the prosecution introduced evidence of a defendant's

untruthfulness before a grand jury solely to undermine his credibility)).

The Supreme Judicial Court then stated its new prospective rule requiring such warnings was "not a new constitutional rule" but instead an exercise of its superintendence authority. Woods I, 466 Mass. at 718-20 (citing Pacheco-Ortiz, 889 F.2d at 308 (explaining that the grand jury context "gives rise to a kind of coerciveness suggesting the wisdom of giving at least notice that a witness need not testify if such would incriminate him"); United States Attorneys' Manual § 9-11.151 (requiring federal attorneys to advise persons appearing before a grand jury of their rights)). The Supreme Judicial Court did not explicitly state "the government's actions are constitutional," but its decision to act through its supervisory power only, and its determination that the new rule did not apply to Woods' case, mean that it necessarily decided the constitutional issue. See Harrington v. Richter, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

In his reply brief and in a post-hearing memorandum, Woods further argues that the Woods I court misunderstood his argument

on appeal.  See Pet'r's Reply 1-5, ECF No. 42; Post-Hearing Mem.
2, ECF No. 50.  Woods contends that he had never alleged that he
was entitled to a target-warning, but instead had argued that
his compelled testimony should have been suppressed under the
Fifth Amendment.  Id. at 1-2.  Indeed, in his original brief
before the Supreme Judicial Court, Woods framed his question on
appeal as whether "use of the grand jury testimony against him
at his murder trial impermissibly infringed on defendant's 5th
Amendment and art. 12 rights against compelled self-
incrimination . . ."  S.A. I 61.

     This appears to be a distinction without a difference.  The
potential Fifth Amendment violation occurred at the point where
Woods' testimony was introduced at trial, see Chavez v.
Martinez, 538 U.S. 760, 767 (2003), but the only potential
constitutional problem with introducing the grand jury testimony
at trial was the government's failure to warn him of his rights
as a target.[2]  See Washington, 431 U.S. at 191 (remanding lower
court's suppression order after determining circumstances of
grand jury testimony were not coercive).  The Supreme Judicial

---

[2] The Supreme Court unequivocally has held that there is no
general constitutional problem with calling the target of an
investigation before a grand jury, and this Court does not read
Woods' original briefs as making this claim.  See Mandujano, 425
U.S. at 573 ("It is in keeping with the grand jury's historic
function as a shield against arbitrary accusations to call
before it persons suspected of criminal activity, so that the
investigation can be complete.")

Court conducted its constitutional inquiry by reviewing the motion in limine hearing where Woods asked that the evidence be excluded.  Woods I, 466 Mass. at 717; see also Woods II, 480 Mass. at 233.  There is no difference, from a constitutional perspective, between evidence being excluded at a motion in limine hearing versus excluded at trial.  Thus, the Supreme Judicial Court did rule explicitly on whether a constitutional violation occurred, though it did not discuss Woods' requested remedy.

Woods also argues that his constitutional claim was not adjudicated on the merits because the Woods II court, relying on the Woods I opinion, decided on state grounds (rather than constitutional grounds) that no warnings were required at the time of his testimony despite his target status.  Post-Hearing Mem. 2-3 (citing 480 Mass. at 237).  On habeas review, however, this Court looks to the entirety of Woods' record on appeal, and because the Woods I court decided the federal constitutional question, the decision by the Woods II court not to grapple with the constitutional issues does not change the analysis.

In conclusion, because the Fifth Amendment issue was decided on the merits by the courts of the Commonwealth, this Court may review it only under the strict standard imposed by AEDPA.

2.   **AEDPA Precludes this Court from Conducting**
**Independent Review of the Supreme Judicial**
**Court's Fifth Amendment Analysis**

As the Supreme Judicial Court has already decided Woods'
Fifth Amendment argument on the merits, and its constitutional
analysis was neither contrary to nor involved an unreasonable
application of established Supreme Court precedent, this Court
cannot grant a habeas writ.  See 28 U.S.C. § 2254(d)(1).

The standard for determining whether federal law is
"clearly established" is whether it is dictated by "the
holdings, as opposed to the dicta" of Supreme Court decisions.
Taylor, 529 U.S. at 412.  A court conducting habeas review may
look to decisions by other federal courts to inform its analysis
of whether the state court's decision was "objectively
unreasonable," for example by seeing how those courts applied
the Supreme Court's holdings to a particular set of facts.  See
Evans v. Thompson, 518 F.3d 1, 10 (1st Cir. 2008).  Decisions by
lower federal courts are not binding on a state court, however,
id. at 8, and "[i]t is not 'an unreasonable application of'
'clearly established Federal law' for a state court to decline
to apply a specific legal rule that has not been squarely
established by th[e Supreme] Court."  Knowles v. Mirzayance, 556
U.S. 111, 122 (2009) (citations omitted).

Woods argues that even were this Court to determine that the Supreme Judicial Court decided the due process issue on the merits, this Court ought nonetheless rule that the decision contradicted clearly established precedent. Pet'r's Suppl. Post-Hearing Mem. 3-5, ECF No. 51. Woods argues the Supreme Court has "broken sufficient legal ground" implicitly to create a due process right to warnings for the target of a grand jury investigation. Id. at 2 (quoting Williams, 529 U.S. at 381-82 (plurality opinion)). In doing so, he cites multiple cases that examine a witness's due process rights before a grand jury.[3] The language from these opinions does not, however, add together cumulatively to create "clearly established Federal law" because none of them is a holding addressing the constitutional issue here. See 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 412.

There is, instead, precedent from the Supreme Court indicating that the law in this area is unsettled. In Mandujano

---

[3] See Pet'r's Suppl. Post-Hearing Mem. 3-5 (quoting Counselman v. Hitchcock, 142 U.S. 547, 562 (1892) ("[A] person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime."); Chavez, 538 U.S. at 767-68 ("[T]he government may compel witnesses to testify at trial or before a grand jury, on pain of contempt, so long as the witness is not the target of the criminal case in which he testifies."); Salinas v. Texas, 570 U.S. 178, 184-85 (2013) ("[A] witness need not expressly invoke the privilege [against self-incrimination] where some form of official compulsion denies him a free choice to admit, to deny, or to refuse to answer.") (citations and internal quotation marks omitted)).

the Supreme Court faced the question of whether a lower court was correct to suppress a witness's testimony, when that witness was a likely target of the investigation and had received some rights warnings but not the full Miranda warnings. 425 U.S. at 566. In the course of deciding that the defendant's rights had not been violated, the Supreme Court noted that "[t]he fact that warnings were provided in this case to advise respondent of his Fifth Amendment privilege makes it unnecessary to consider whether any warning is required." Id. at 582 n.7. Similarly, in Washington, where the Supreme Court held the government did not have a constitutional obligation to warn a witness of his target status, it explicitly left undecided the issue of whether any Fifth Amendment warning was required. 431 U.S. at 186. The government in that case had advised the witness of his general Fifth Amendment rights as a grand jury witness, and the Supreme Court explained that it was not ruling on "whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses; moreover, [it had] no occasion to decide these matters today," id., later adding, "[s]ince warnings were given, [it was] not called upon to decide whether such warnings were constitutionally required," id. at 190.

Those are the last direct words from the Supreme Court on the matter. To address Woods' constitutional claim at all the Supreme Judicial Court had to decide without the benefit of a

"squarely established" rule from the Supreme Court, so this Court cannot rule that the decision of the Supreme Judicial Court -- not to extend the law to provide Woods constitutional protection -- was error on habeas review.  See Mirzayance, 556 U.S. at 122.

This is not to say that, on de novo review, this Court would, or would not, find that the government violated Woods' (or another defendant in similar circumstances) constitutional rights, but "federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." Williams, 529 U.S. at 383 (plurality opinion).

Neither is it to say, though, that this Court approves of the prosecutor's failure to warn Woods of his rights.  The reasoning from Pacheco-Ortiz is particularly instructive,  889 F.2d at 308-11, and the Supreme Judicial Court relied in part on it in crafting its prospective rule requiring target warnings, See Woods I, 466 Mass. at 718 (citing 889 F.2d at 308).  The facts in Pacheco-Ortiz were highly similar to those in this case, though Pacheco-Ortiz occurred in federal, rather than state, court.

In Pacheco-Ortiz, the prosecutor failed to give the defendant any formal warnings prior to his grand jury testimony (despite internal Department of Justice guidelines requiring him

to do so) and neglected to tell him of his target status.  889

F.2d at 309.  The defendant then gave exculpatory testimony

before the grand jury, which the government introduced at trial

to suggest these false sworn statements indicated consciousness

of guilt.  Id.  The First Circuit rebuked the prosecutor, noting

that in the recent case of United States v. Babb, "[it] assumed

that some warning was constitutionally mandated." Id. at 308

(citing 807 F.2d 272 (1st Cir. 1986)).  It then determined the

defendant's constitutional rights had not been violated, in part

because "the Fifth Amendment privilege does not provide a shield

against perjury." Id. at 309 (quoting United States v. Wong,

431 U.S. 174, 178-80 (1977)).  It therefore considered the

prosecution's failure to warn a harmless error.  Id. at 310.

While declining to suppress the evidence,[4] the First Circuit

warned the Department of Justice that it may refer prosecutors

that failed to give warnings in the future to the Office of

Professional Responsibility.  Id. at 311.

This Court is constrained on habeas review.  In federal

court, Woods would have been able to rely on the First Circuit

---

[4] The court in Pacheco-Ortiz noted that the Second and Third
Circuits both favored a remedy of suppression when prosecutors
failed to provide target warnings.  889 F.2d at 308-09 (citing
United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976), cert.
granted, 431 U.S. 937 (1977), cert. dismissed, 436 U.S. 31
(1978); United States v. Crocker, 568 F.2d 1049, 1056 (3d Cir.
1977)).

precedents of Babbs and Pacheco-Ortiz, rather than cite them as mere "reference point[s]." Evans, 518 F.3d at 11. He might have been able to build a stronger case that his due process rights had been violated. This would be particularly true if he could have shown that the prosecution's failure to give warnings was not "harmless error" from a constitutional perspective, see Pacheco-Ortiz, 889 F.2d at 310, or if he could cite as precedential the First Circuit's "considerable sympathy" for target warnings. Id. at 308 (quoting United States v. Chevoor, 526 F.2d 178, 181-82 (1st Cir. 1975)). He is statutorily barred from doing so here, however, by the language of AEDPA, section 2254(d)(1), which allows only Supreme Court holdings to serve as a basis for granting the writ of habeas corpus.

This requirement is one of many ways that AEDPA ties the hands of this Court. Since 1996, when Congress passed AEDPA, the power of federal judges to enforce the Great Writ has been significantly curtailed. No longer are judges free to review state court decisions de novo, see Brown v. Allen, 344 U.S. 443, 506 (1953) (Frankfurter, J.), but instead must submit to the decision of the state court except in a few very narrow circumstances. See 28 U.S.C. § 2254(d). As a result of AEDPA's heightened standard of deference and stringent procedures, far fewer prisoners are now able to succeed in their petitions. See Nancy J. King, Fred L Cheesman II & Brian J. Ostrom, Final

Technical Report: Habeas Litigation in U.S. District Courts: An Empirical Study of Habeas Corpus Cases Filed by State Prisoners Under the Antiterrorism and Effective Death Penalty Act of 1996, National Institute of Justice, Department of Justice (Aug. 21, 2007), https://www.ncjrs.gov/pdffiles1/nij/grants/219559.pdf.[5]

Indeed, it could be argued -- and judges in other circuits have -- that AEDPA's shrunken universe of habeas law (Supreme Court holdings only) so constrains the "duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), that it is constitutionally suspect. See Irons v. Carey, 479 F. 3d 658, 668-70 (9th Cir. 2007) (Noonan, J., concurring); Davis v. Straub, 430 F.3d 281, 296-97 (6th Cir. 2005) (Merritt, J., dissenting); Lindh v. Murphy, 96 F.3d 856, 886-90 (7th Cir. 1996) (Ripple, J., dissenting).  The First Circuit has dismissed these arguments by ruling that AEDPA is an exercise of Congress's ability to set the procedures and remedies available in federal courts, rather than an

---

[5] The study examined a random sample of 2384 non-capital district court cases and found that courts granted relief in seven of them -- a rate of one in 284.  King et al., supra, at 58.  Prior to the passage of AEDPA, approximately one in 100 cases resulted in relief, a rate nearly three times higher.  Id. The study also found that a greater proportion of post-AEDPA cases were for serious crimes than pre-AEDPA, Id. at 54-55, so it is possible that the types of cases in the sample affected the rate of relief.  Yet the dramatic reduction in the grant of relief suggests that there are many cases that have been blocked by AEDPA that a district court may otherwise have deemed meritorious.

unconstitutional attempt to guide the courts' discretion.
Evans, 518 F.3d at 8-9.  The First Circuit's reasoning binds
this Court, but it retains concern over how the law operates in
practice.

AEDPA has thus foreclosed one of Woods' possible avenues
for relief.  This Court is severely restricted in examining
whether his rights were violated because the Supreme Judicial
Court's decision did not contravene Supreme Court precedent when
the Supreme Court has not decided the issue.  The Court
therefore must reject Woods' argument that his due process
rights were violated.

D.   **Woods' Prosecutorial Misconduct and Ineffective
     Assistance of Counsel Claims**

Woods' third and final argument concerns the trial court's
determination that he was not the target of the investigation.
Pet'r's Mem. 16.  At a preliminary hearing, the prosecution
denied that Woods was already a target when he testified before
the grand jury.  Id. at 18.  Woods' attorney failed to introduce
into evidence (without a "strategic reason") the transcripts of
testimony that indicated Woods had made threats against the
victim and that the prosecutor was focusing his questioning on
him.  Id., Addendum 2, Aff. John A. Amabile ¶ 8, ECF No. 41.  It
was these grand jury transcripts that later led the motion judge
to determine that Woods was in fact a target.  S.A. I 243.

Woods argues that he was deprived of a fair hearing and a reasonable determination of voluntariness because of prosecutorial misconduct and ineffective assistance of counsel. Pet'r's Mem. 16 (citing Jackson v. Denno, 378 U.S. 368, 376-77 (1964)).  Woods contends that, though the Supreme Judicial Court rejected his argument, it did so using the wrong standard. Id. at 17 (citing Woods II, 480 Mass. at 239 n.10; Linkletter v. Walker, 381 U.S. 618, 639 n.20 (1965)).  Woods argues that the correct standard is whether he was deprived of due process because the trial judge did not have the facts necessary to make a "reliable determination that his statements before the grand jury were in fact voluntarily rendered."  Id. at 18-19.  Regarding the ineffective assistance of counsel claim, Woods states that there is a "reasonable probability" that the trial court would have determined he was a target had his counsel filed the grand jury transcripts.  Id. at 19-20.

The Woods II court declined to address the question of whether the prosecutorial misconduct or ineffective assistance of counsel claims were viable, because it held that whether Woods was a target was not relevant.  480 Mass. at 239 n.10.[6]  It

_____

[6] There is a rebuttable presumption that any claim properly brought before the state court was adjudicated on the merits. See Harrington, 562 U.S. at 100; Magraw v. Roden, 743 F.3d 1, 9-10 (1st Cir. 2014).  Here, however, the Supreme Judicial Court said "we need not address" Woods' ineffective assistance of

explained that Woods' case was based on "an alleged violation of a right that simply did not exist at the time of trial." Id. Because these claim were not specifically adjudicated this Court reviews them de novo, Pike, 492 F.3d at 67, though it finds the Supreme Judicial Court's analysis persuasive regarding the harmlessness of the alleged errors.

Regarding ineffective assistance of counsel, the relevant test comes from Strickland v. Washington, 466 U.S. 668, 687 (1984).[7] Under Strickland, a reviewing court can find that counsel's actions could have deprived the defendant of his due process rights if counsel's performance was "outside the wide range of professionally competent assistance," Id. at 690, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Woods argues that there is a "reasonable probability" that the outcome of trial would be different had his counsel properly introduced the grand jury testimony to the trial judge. Pet'r's

_____

counsel or due process arguments, which rebuts the assumption. 480 Mass. at 239 n.10.

[7] Massachusetts state courts apply the standard from Commonwealth v. Saferian, which asks whether "there 'has been serious incompetency, inefficiency, or inattention of counsel,'" and whether counsel's behavior "likely deprived the defendant of an otherwise available, substantial ground of defence." 366 Mass. 89, 96 (1974). For federal habeas purposes, "Saferian is a functional equivalent of Strickland." Ouber, 293 F.3d at 32.

Mem. 19-20.  Woods had no legal right to a warning prior to his
grand jury testimony.  See Woods II, 480 Mass. at 239.  The
Supreme Judicial Court noted that even if the trial judge had
reviewed the grand jury testimony, he may not have concluded
that Woods was a target at the time, and further would not have
been required to issue a warning because it was not
constitutionally required.  Id.

To succeed on the prejudice branch, a petitioner must show
two things.  First, when an attorney fails to take reasonable
steps to suppress evidence damaging to the petitioner's case,
the petitioner must, at a minimum, show that the motion to
suppress would have been granted but for the attorney's
unreasonable action.  Walker v. Medeiros, 911 F.3d 629, 633 (1st
Cir. 2018).  The petitioner must then show that success on the
motion to suppress would be reasonably probable to lead to a
different result at trial.  Id.  Wood's contention fails on the
first step.  This Court agrees with the Supreme Judicial Court
that Woods would have been successful at the motion in limine
hearing only had the trial judge chosen to exclude the evidence
at his own discretion, making his contention mere speculation.
Woods II, 480 Mass. at 239.  It was not prejudicial, therefore,
that Woods' counsel did not submit the grand jury testimony to
the trial judge.

Regarding prosecutorial misconduct, a reviewing court may find reversible error when a prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citation omitted).  In analyzing this question, courts engage in "harmless-error analysis". Arizona v. Fulminante, 499 U.S. 279, 306-07 (1991).

Here, the government's action -- declining to label Woods a "target" -- is not likely to have affected the trial's outcome. Even if one assumes the prosecutor was intentionally lying to the court, as opposed to having made a subjective judgment that Woods was not yet a target,  Woods had no constitutional or state right to have that evidence suppressed regardless of his status as a target. Woods II, 480 Mass. at 239.  Thus, the ultimate effect on the trial is entirely speculative.  see United States v. Casas, 425 F.3d 23, 40-41 (1st Cir. 2005) (holding that prosecutor's deception of the trial court did not affect due process rights of defendant when it was not likely to have affected ultimate decision at trial).  Since the question would make no difference in the final determination, this Court declines to reanalyze whether the prosecutor's actions actually constituted misconduct.

## IV. Conclusion

For the foregoing reasons, Woods' petition for a writ of habeas corpus is DENIED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE